## CHARTER GAS ENGINE COMPANY
### v.
## JOHN CHARTER.

*Patents—Corporation— Meetings—Legality   of—Evidence—Instruc-tions.*

1.   A licensee can not raise the question of the validity of a patent as between the patentee and the United States, where such license has not been molested; because in such case the licensee has got all he bargained for.

2.   While a stockholder represents no interest but his own, a director occupies a trust relation toward all the stockholders. That relation demands that he should act in the interest of those whom he represents. He is bound to manage the business intrusted to him in the interest of the stockholders alone, and may not administer the affairs of the corpo-ration for his private emolument.

3.   Without the consent of the stockholders of a corporation, a director can not become a contractor therewith, or have any personal or pecun-iary interest in a contract between it and a third person, and such con-tracts, if made, are voidable at the instance of the corporation or of stockholders.

4.   Such director may loan money to his corporation and take securities, and obtain debts due him therefrom. A corporation may also avail itself of the property of such director or officer under circum-stances implying a contract to pay a reasonable compensation therefor. If money has been advanced or property furnished in good faith by such person, the corporation is liable to him on an implied assumpsit.

5.   Plaintiff having claimed to be a director and acted as such, is to be treated as such so far as his claim against the defendant is concerned.

6.   An instruction setting forth that if a certain quantity of stock was voted at a meeting, for persons named, they were elected as officers of

Charter Gas Engine Co. v. Charter.

the corporation in question, and ignoring the question whether any notice was given which would authorize the meeting at all, was bad.

7. As it is a question of law what will make a valid contract, so it is a question of law what will make it valid as a ratification, if proven, and an instruction authorizing the jury to determine the question of ratification should not be given.

8. Ratification or acquiesence which will prevent resistance to a voidable contract must be established by the conduct of given parties. The right to repudiate must be lost by affirmative act, or by unreasonable delay after opportunity to act with freedom and with full knowledge of all material facts.

9. The second special plea in the case presented, alleging that the contract was made upon the condition therein stated that plaintiff should and would protect defendant in its monopoly under the patent, but that the patent had been continuously infringed, whereby defendant was injured, and that the plaintiff, though notified, took no steps to interfere or protect defendant, *held*, that said plea was bad in not setting up any defense to the promise to pay a sum named for past use of the patent, and also because under its averments all that could be claimed by defendant would be the damage suffered, and no damages were alleged.

10. Publication of notice in a newspaper of proposed meeting is not equivalent to personal notice or notice by mail. A meeting can be held after improper notice only when all stockholders are present and consenting in person or by proxy.

[Opinion filed May 25, 1893.]

Appeal from the Circuit Court of Whiteside County; the Hon. James Shaw, Judge, presiding.

Mr. John G. Manahan, for appellant.

The term " *de facto* officer " implies, from its terminology, that the person referred to is not a real officer, but only pretending to be such. His want of right to the office is conceded, and the only inquiry in reference to him is, as to what persons are bound to take notice of his want of title. A *de facto* officer is really and *per se* no officer at all. But, to protect those who may be fairly presumed to be ignorant of his want of title, the rule obtains that third parties, and the public, may rely upon the simple fact that he is acting in such official capacity. Winneshiek Ins. Co. v. Holzgrafe, 53 Ill. 516.

In Waterman v. C. & J. R. R. Co., 34 Ill. App. 268, Waterman sued the company for services rendered while presi-

dent *de facto*, and it was held that he was bound by his own knowledge of the infirmity of his title, *i. e.*, the incapacity of a mere *de facto* board of directors, of which he was one, to hire him. This case has since been affirmed by the Supreme Court. 139 Ill. 658.

"The acts of a *de facto* officer are not valid when they are for the benefit of the officer, a person not being permitted to take advantage of his own wrong." Wait's Actions and Defenses, Vol. 5, p. 9, and cases cited.

"The doctrine, as to an officer *de facto*, is only operative to protect persons who have trusted to his apparent right to perform the duties of the office." People v. Albany R. R. Co., 55 Barb. 344.

"An officer *de facto* exists merely by sufferance, and can not assert any affirmative claim of any sort." Christian v. Gibbs, 53 Miss. 314.

"In order to protect third persons, transacting business with such officers under such circumstances as to induce in them the belief that they are dealing with legal officers, the law reaches out upon the principle that although they be not officers *de jure*, they are officers *de facto*, whose acts public policy requires shall be considered valid." "This principle, however, is not to be, and will not be extended to a case where the rights of public or third persons are not affected, nor where all the parties in interest have knowledge that the person pretending to be an officer is not such in law, for in such case the reason of the law no longer exists." 6 Am. Corporation Cases, 148, and note.

"The acts of a *de facto* officer are valid only so far as the rights of the public and of third persons having an interest in such case, are involved; but such officer can claim nothing for himself." The People ex rel. v. Weber, 86 Ill. 283; cited and approved in 89 Ill. 348.

Charter, therefore, being not a third party, and having a full knowledge of the infirmity of his own title, can base no claim on the proposition that the aforesaid board of directors were *de facto* officers, and it can add no force to his position to state that he is suing as a private person.

So was Waterman in the case cited in the 34th Appellate. The inquiry is rather as to the identity of the person; *i. e.*, whether he is a third person or not; and, having actual knowledge of the want of legality of said board, including himself, is not within the rule which is solely for the protection of those ignorant of the want of title of *de facto* officers.

The doctrine that an agent can not put himself, in reference to the property of his principal, in a position adverse to the latter, is illustrated by the following cases: Wickliff v. Robinson, 18 Ill. 145; Hughes v. Washington, 72 Ill. 84; Cottom v. Holliday, 59 Ill. 176; Ely v. Hanford, 65 Ill. 267.

In this case, the fact of Charter acting as a director of the company is shown by the testimony under the general issue and the first special plea, and the question here presented is, whether the corporation, having repudiated the contract, and declining to be bound by it, and having paid nothing thereunder, can be held thereby. No reputable authority can be found to sustain the right of a director to make such continuing executory contract as the one in suit, with his own corporation. Some of the authorities hold such an attempt to be void *ab initio;* others that it is voidable at the instance of the corporation; *i. e.*, that the corporation may repudiate it, as an infant would his, and as has been done in this case.

"A director of a corporate company can not become a contractor with the company, nor can he have any personal or pecuniary interest in a contract between a company of which he is a director, and a third person." Michoud v. Gerod, 36 Ind. 60; 4 Howard (U. S.) 503; Coal and Iron Co. v. Sherman, 30 Barb. 553; Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Maryland, 456.

"Directors are both agents and trustees, and can not contract with themselves." Ward v. Davison, 36 Am. Rep. 40; 1 S. W. 486.

"Contracts between directors of a corporation and the corporation are voidable, either by the company or its

stockholders." Beach on Corporations, 242–243, and cases cited.

"Persons who become officers and directors of a corporation place themselves in position of trustees, and the relation of trustees and *cestui que trust* is thereby created between them and the stockholders." ·Butts v. Wood, 37 N. Y. 317; Spofford v. Texas Land Co., 50 How. (N. Y.) 522; Bliss v. Mattison, 45 N. Y. 22; York Railway Co. v. Hudson, 19 Eng. Law and Eq. 365; Yoehler v. Black River Co., 2 Black. (U. S.) 715.

"Holding a fiduciary relation, they can not be permitted to acquire interests adverse to such relation." European Railway Co. v. Poor, 59 Me. 277; Jackson v. Ludeling, 21 Wall. 616.

It has accordingly been held that a director of an incorporated company can not become a contractor with the company, nor can he have any personal or pecuniary interest in a contract between the company of which he is a director and a third person. Port v. Russel, 1 Am. Rep. 5, 12, note.

"Directors can not be interested, directly or indirectly, in contracts made with the corporation. Such contracts are voidable at the instance of the company, or of stockholders." Polar Star Lodge v. Polar Star Lodge, 16 La. An.; Paine v. L. E. & L. R. R. Co., 31 Ind. 283; San Diego v. San Diego, etc., Co., 44 Cal. 106; Flint, etc., Railway Co., v. Dewey, 14 Mich. 477; St. James Church v. Church of the Redeemer, 45 Barb. 256.

In the case of the Aberdeen Railway Co. v. Blakie, 1 Macy App. Cases, 461, the House of Lords, reversing the judgment of the court below, held that a contract that was entered into by a manufacturer for a supply of iron furnishings to a railway company, of which he was a director at the date of the contract, was invalid and not enforcible against the company. Cited in 36 Ind. 60.

In Merrick v. Peoria Coal Co., 61 Ill. 479, and in Hartz v. Brown, et al., 77 Ill. 226, our Supreme Court has sustained the right of a director to loan money to his corporation;

but in Beach v. Miller, 130 Ill. 170, the language of those cases was largely modified, and the court declined to be bound by a statement therein, that a director might trade with his company on the same terms and in like manner as other persons.

In the latter case the only question was whether a director, as such, could contract with himself, where the corporation became insolvent, and it was held that he could not, as the property of the corporation then became a trust fund for the creditors. But the court declares that the directors are trustees for the shareholders during the solvency of the corporation, and quotes approvingly from Ogden v. Murray, 39 N. Y. 202, as follows: "Trustees, and persons standing in similar fiduciary relations, shall not be permitted to exercise their powers, and manage or appropriate the property of which they have control for their own profit or emolument, or, as it has been expressed, shall not take advantage of their situation to obtain any personal benefit to themselves at the expense of the *cestui que trust.*

What is really decided in the Beach case is that the directors may not deal with the company in their own interest after the same becomes insolvent.

In Roseboom v. Whittaker, 132 Ill. 87, is a like decision upon the same question. In neither of these cases is there a contract between the director and his corporation sustained. It is a little difficult to understand why the fact that the directors are trustees for the stockholders during the solvency of the corporation should not as much disqualify them from acting with the board in their own interest, as does their trusteeship for the creditors, when the corporation has become insolvent; nor why their position as trustees in the first instance should not disqualify them to as great extent as their trusteeship in the last instance. In Chicago Cab Co. v. Yerkes, 141 Ill. 320, our Supreme Court holds a director disqualified to buy the corporate property.

The contract in question here, which involves a transfer of a large proportion of the earnings of the company for a series of years to one of its directors, presents a very serious

question. Here the appellee had control of the board, and the minority had to do the best they could. But even under this alleged contract he is to receive thousands of dollars each year, whether the stockholders have anything or not, and, if these pleas are true, the stockholders receive no benefit from him, and no return for these sums of money.

In Wardell v. U. P. R. R. Co., 13 Otto, 651, the Supreme Court says: "The law, therefore, will always condemn the transactions of a party on his own behalf, when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is season ably resisted. Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect. They can not, as agents or trustees, enter into nor authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits." Citing several cases.

"Every member has a right to be present at all meetings of the corporate body, and must, in some manner, be notified to attend the same. And the omission to give the required notice, though accidental, will generally invalidate the proceedings at the meeting. Even the absence of a member from home will not excuse the want of notice." State v. Ferguson, 31 N. J. L. 107; People v. Bachelor, 22 N. Y. 128; Smyth v. Darley, 2 H. L. Cas. 789; Rex v. Langhorn, 4 Ad. & E. 538; San Buenaventura Mfg. Co. v. Vassault, 50 Cal. 534; People v. Albany, etc., R. R. Co., 55 Barb. 344; Jackson v. Hampden, 20 Maine, 37; Angell & Ames on Cor., Sec. 492, and cases cited.

"Where the charter of a joint-stock corporation prescribes the mode of giving notice of the time and place of holding meetings of stockholders, that mode must be pursued, or the notice will be ineffectual." Shelby R. R. Co. v. Louisville, etc., R. R. Co., 12 Bush. 62; see also Hardin v. Van DeWater, 40 Cal. 77; Stevens v. Eden Meetinghouse, 12 Vt. 688.

Mr. C. C. JOHNSON, for appellee.

Article 4 of By-Laws provides: "A majority of the board of directors and a two-thirds majority of stockholders shall constitute a quorum for doing business at any meeting." So that not only was this annual meeting held upon the notice provided by the by-laws, but there was more than a quorum present.

There is no doubt of the proposition that a majority of the stockholders, at a regular meeting called, may make any combination or agreement not contrary to law, to elect a majority of the directors or obtain control of the corporation.

The Supreme Court in the case of Fields v. Yates, 57 Ill. 416 says: "Three persons owning a majority of the stock, had the unquestioned right to combine, and thus secure the board of directors and the management of the property. . Corporations are governed by the republican principle that the whole are bound by the vote of the majority when the acts conform to the law of their creation."

John Carter, in his testimony, says: "To the best of my recollection, there were 798 votes at the stockholders' meeting in January, 1891; 456 votes as to three of the directors who had the highest number of votes, and 572 as to the three and including the fourth one. If the persons voting had one vote for each share of stock they represented, there would still be a majority for these four directors. That is, each of the four directors would have been elected if a single vote had been cast for each share of stock."

Mr. Robinson corroborates this statement. In fact, it is conceded that if the persons voting on the cumulative plan had instead voted one vote for each share of stock, the persons for whom they voted would have still received the highest number and have been elected.

Under no circumstances could the stockholders present be deprived of one vote for each share of stock, and, in any event, the vote polled should have been so counted. And in this case it made no difference whether a majority of stockholders voted on the cumulative plan or otherwise; the

result would inevitably have been the same, as it was clear, from the vote cast, the majority of the stockholders intended voting for the directors elected.

It is difficult, then, to see either the importance of the plea or proof of the election of the directors by the cumulative method of voting.

The votes cast by the majority of the stockholders, even if upon the cumulative plan, was understood by the meeting to result, whichever way counted, in the election of the four directors receiving the highest number of votes, for that the same was spread upon the records of the meeting without objection, and the directors so elected were allowed to act through the whole year; and at the next annual election, January 19, 1892, "the records of the last meeting were adopted."

But if it should appear there was irregularity in the election of such directors, yet, nevertheless, they would be directors *de facto*.

Not only was the election recorded in the records of the company, and acquiesced in at the time by the stockholders, but that such directors were permitted to act during the whole year as the only directors of the company. On the same day of their election they met and elected George M. Robinson president, and John G. Manahan secretary, who afterward conducted the business of the company, for that year, as the only acting president and secretary. They met on June 29, 1891, and appointed a committee to confer with appellee. They again met on July 8, 1891, and accepted the proposition of appellee, and directed the making the contract sued on. The proceedings were recorded in the books of the company as the proceedings of the company's board of directors. Their agent, Robinson, president of the company, entered in the books of the company the $4,000 agreed upon in settlement of past royalties, and also $818.16 royalties due under the new contract, for the first three months, to October 1st, according to the terms of the contract. They continued manufacturing the engines of appellee's invention and appropriated the full proceeds. At

the annual meeting of the stockholders, in the following year, the record of the election of the directors was approved.

The evidence abundantly shows that the irregularities in the election of the directors, if any there were, were waived by the company, and their election ratified. And the jury might well come to the conclusion, under the pleading and instruction of the court, that the company ratified the election of such directors.

The court will bear in mind that in the month of January, 1891, the directors were elected, and the contract, as set out in the declaration, is dated July the 9th, 1891. For six months, then, and for the full term of office, as a matter of fact, these directors, although now claimed to be irregularly elected, were allowed to act, not only in the making of the contract, but all the business of the company; every transaction, except that delegated to other agents, they were allowed to do and perform. Can it be said now, after they were allowed to serve out their term of office, and new directors elected, that these directors were not *de facto* directors in the making of this contract, and by whose acts it is bound ?

" A *de facto* officer," said Lord Ellenborough in The King v. The Corporation of Bedford Level, 6 East R. 368, " is one who has the reputation of being the officer he assumes to be, and yet he is not a good officer in point of law." Angell & Ames, Sec. 287, 6th Ed.

In the case of Baird v. The Bank of Washington, 11 Serg. & Rawle (Penn.) 411, the bank was governed by a board of thirteen directors ; nothing less than a majority of the whole constituted a quorum ; a director was elected at a meeting at which five only of the directors were present ; it was held " that, having a color of election, he was a director *de facto*, and that, as an agent of the corporation, his acts were valid, at least between the bank and third persons."

" A person, by color of election, may be an officer *de facto*, though indisputably ineligible." Angell & Ames on Corp., Sec. 287; again in Angell & Ames, Sec. 137.

"An irregular election, as in case of the election of an unqualified person, is voidable only, and not actually void; and hence the acts of trustees of a religious corporation, irregularly elected, yet in *coloro officii*, will be valid until such trustees are ousted by judgment at the suit of the people." Trustees of Vernon Soc'y v. Hill, 6 Con. (N. Y.) 23; and again in same work on corporations, Sec. 286.

"Though the charter or act of incorporation prescribes the method in which the officers of a corporation aggregate shall be elected, and an election contrary to it would unquestionably be voidable, yet, if the officer has come in under the color of right, and not in open contempt of all right whatever, he is an officer *de facto*, within his sphere— an agent of the corporation—and his acts and contracts will be binding upon it." (Citing a large number of authorities.)

In the Bank of the United States v. Dandridge, 12 Wheaton U. S. R., 79, Justice Story says: "Persons acting publicly as officers of the corporation are to be presumed rightfully in office. If officers of a corporation openly exercise a power which pre-supposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed."

In Lovett v. The German Reformed Church, 12 Barbour, 67, the court says: "Corporations that have permitted particular individuals to take possession of their property, their seal and their records, to act as their trustees, and have, in fact, held them out to the world as their trustees, and as authorized to act for them, are, as much as an individual would be, estopped from questioning the acts of their agents, within the scope of their apparent authority."

In the case of The Dispatch Line of Packets v. Bellamy Manufacturing Co., 12 N. H. 205, a law of a corporation provided that any person chosen a director should cease to be one when he ceased to be a proprietor; held that this, by implication, rendered any one not a proprietor ineligible to the office.

If a corporation elect a person a director who is ineligible to that office, and permit him to act as such, the corporation will be barred by the acts which he performs within the scope of the authority possessed by a director.   " By electing him a director, and permitting him to act as such, the corporation held him out to the world as a director, as one of their agents, having all the power of an agent of that description, and to be trusted as such.   The corporation, when Emery was elected, had the means of knowing whether he was qualified according to their by-laws; they left his election on the records and permitted him to act, etc.   It is a settled rule that a person is bound by the acts of another whom he has held out to the world as his agent for that purpose." Davis v. Lane, 10 N. H. 156;  Beard v. Kirk, 11 N. H. 397.

We therefore submit that the appellee had an unquestioned right, even although a member of the board, to enter into the contract with them.   That the whole board were the *de facto* officers of the company, which only is necessary to make the contract of any person dealing with them valid.

That election of directors, although irregular, is not void, only voidable.

In Morawetz on Private Corporations, 100, the author lays down the rule:   " If a contract entered into by a corporation has been performed by either of the parties, the other party can not set up as a defense to an action for the breach of such contract, that the corporation had no authority to enter into it."   Again, on page 101:   " It has sometimes been said that after a corporation has received the benefit of a contract made in excess of its chartered powers, it will be estopped from denying that it had authority to make the contract."   Bradley v. Ballard, 55 Ill. 413;  Chicago B'ld'g Soc'y v. Cromwell, 65 Ill. 454;  Racine R. R. Co. v. Farmers' S. & T. Co., 49 Ill. 346;  Newberg Petroleum Co. v. Weare, 27 Ohio State, 343;  City of St. Louis v. St. Louis Gas Light Co., 70 Mo. 69.

In the case of Batelle v. Northwestern Cement & Concrete Pavement Company, 33 N. W. Reporter, (Minn.) 327, where an agreement for the conveyance of property to the

company was made before the company was organized, and the property conveyed and used by the company, the court say: "After receiving the benefit of the previous engagement, and accepting and using the property in its business, knowing that, as a part of the price of the property, the corporation was to pay the indebtedness, it can hardly be permitted now to deny its liability to pay it."

In Chicago Building Soc'y v. Cromwell, 65 Ill. 453, the court says: "When corporations have exercised power incidental to those conferred, and in furtherance of the general objects of the corporation, although the subject of the contract may not be within any expressed right conferred, they will be estopped from denying that they had authority to make such contracts. * * * The rule has its foundation in the plainest principles of justice."

"When such corporations have received the benefit of a contract, if there is nothing in it that is contrary to public policy, there can be no just reason why they should not be required to perform it."

In the case of Bradley v. Ballard, 55 Ill. 413, a case where a corporation, organized under the laws of this State, borrowed money to do business outside of the State, the court say :

"The corporation has received the money and used it for a purpose which, whether *ultra vires* or not, was unquestionably the sole purpose for which the corporation associated itself together, and for which this complainant became a stockholder. Justice requires the corporation to repay the money it has borrowed and expended." Maher v. City of Chicago, 38 Ill. 268; Darst v. Gale, 83 Ill. 141; Whitney Arms Co. v. Barlow, 63 N. Y. 62; West v. Menard Co. Ag. Board, 82 Ill. 205; Ward v. Johnson, 95 Ill. 215; Peoria & Springfield R. R. Co. v. Thompson, 103 Ill. 187.

We claim that not only has a person the right to make a contract with a company through a board of directors of which he is a member, but in the making of such contract he acts and is regarded as a stranger—a third party. And if the board of directors or agents with whom he is acting

are even *de facto* officers, so allowed to act by the company, the contract entered into being not unreasonable or unfair, it will be binding upon the company and can be enforced.

In Angell & Ames on Corp., Sec. 223, 6th Ed., it is said : " By the common law and by the civil code too, as a corporation aggregate may contract with persons who are not members, so it may contract with persons who are members of it, and the contract is not on this account invalid—a member of a corporation contracting with it being regarded, as to that contract, a stranger. Hill v. Manchester Water Works Co., 5 Barn. & Ado. 1, 866; Rogers v. Danby University Soc'y, 19 Vermont, 191; Culbertson v. Wabash Nav. Co., 4 McLean C. C. (U. S.) 544; City of St. Louis v. Alexander, 23 Missouri, 483, 528.

In the case of The City of St. Louis v. Alexander, 23 Mo. 529, the court maintains the same doctrine—that a director may make a contract with the company of which he is a member, and cites, approvingly, Hayward v. Pilgrim Soc'y, 21 Pick. 270, and Angell & Ames on Corporations, saying that " Chitty says (Chitty on Contracts, 276, note E), a member of a corporation contracting with the company must be deemed, in respect to that contract, a stranger to the corporation."

MR. JUSTICE CARTWRIGHT. Appellee brought this suit upon a contract alleged to have been made and entered into with him by appellant, and set out in his declaration as follows :

" The Charter Gas Engine Company, a corporation of Sterling, Illinois, and John Charter, of same place, in settlement of all questions of royalties, and in lieu of all former contracts between them on the subject, do hereby mutually agree as follows :

Charter hereby grants to said company the exclusive right to manufacture and sell within and throughout the United States and the territories thereof, and in all countries where patents have not been obtained, gasoline engines under U. S. Letters Patent No. 465,388, granted to him

July 7, 1891, for the term of said patent, together with all improvements in gasoline engines which he may hereafter make during said term.

Charter also agrees to accept four thousand dollars ($4,000) in full for royalties on engines made, sold and shipped by said company to July 1, 1891, and ten per cent on net sales of gasoline engines made and sold or shipped by said company subsequent to July 1, 1891, statements of sales to be made to him every ninety days and royalties to be then due and payable on all of said engines then sold and paid for, and in proportion to payments made on any not wholly paid for.

Said company accepts the above and agrees to make said engines of good workmanship and material, and to make all reasonable efforts to introduce and sell gasoline engines containing said patented improvements, and to supply all demand therefor; but in case said company shall be unable to fully supply such demand, said Charter shall have the right to procure additional manufacture of said engines elsewhere.

This contract, however, is made subject to the following mutually agreed upon conditions, to wit:

Said Charter shall prosecute to final issue all infringers of said patent, so as to protect this company in its monopoly under said patent, and in case this company and said Charter can not agree as to whether a certain engine made, sold or used by others, without permission of this company, is an infringement of said patent, said question shall be decided by two reputable patent lawyers or patent experts, one to be selected by each of the parties hereto, and said two so selected, if unable to agree, to mutually select a third person of like attainments to act with them; and the decision of said board or a majority of them, shall be conclusive and binding upon the parties hereto, and if said decision shall be that the construction in question is an infringement of said patent, said Charter shall prosecute, as aforesaid, the parties so offending, or otherwise suppress such infringement.

And it is a further condition of this contract that said Charter guarantees to said company the validity of his aforesaid letters patent to this extent, that if said letters patent should hereafter be declared to be invalid, either by a court or a board of arbiters, which may be constituted as aforesaid, said company is to be no longer under obligations to pay royalties under said patent.

Executed in duplicate by the parties hereto, this 9th day of July, 1891.

CHARTER GAS ENGINE CO.,

[SEAL.]                          G. M. ROBINSON, Pres.

JOHN CHARTER."

The declaration also contained the common counts. To this declaration the defendant pleaded the general issue, and filed four special pleas alleging that said contract constituted the only cause of action and setting up defenses thereto. The first of these special pleas alleged that defendant was organized in 1871, under "An act to authorize the formation of corporations for maufacturing, mining, mechanical or chemical purposes," approved February 18, 1857; that the board of directors who assumed to make the contract in question, were not legal directors of the company, because elected at a pretended stockholders' meeting at which no notice was given to the stockholders as required by said act; that over one-third of the stockholders were not present and without notice or knowledge of the meeting; that such directors received a majority of votes by illegal cumulative voting of certain stockholders, and that plaintiff was a member of said board of directors who made the contract with him. The second special plea alleged that the contract was made upon the condition therein stated that plaintiff should, and would, protect defendant in its monopoly under the patent, but that the patent had been continuously infringed, whereby defendant was injured; yet the plaintiff, although notified, took no steps to interfere with infringements or to protect defendant. The third special plea alleged that the sole consideration of the contract was the representation of plaintiff

that the patent was valid and would give defendant a monopoly of the manufacture and sale of gas engines of the construction and operation described in the patent, but that the patent contained no novel device or combination and did not secure defendant a monopoly in the construction of the gas engines. The fourth special plea, as amended, alleged that at the time of making the contract the patent had not been received by plaintiff, but that he represented to defendant that when received it would secure a monopoly of the manufacture and sale of the essential parts of the gas engine as made by defendant, and demanded $4,000 for royalties on manufactures by defendant from the date of application for the patent to July 1, 1891, and agreed that if defendant would pay said $4,000, and ten per cent of net sales after July 1, 1891, that the patent would secure such monopoly, and that in consideration of that promise defendant entered into the contract; but that the patent did not secure a monopoly because the things claimed as plaintiff's invention were not new or novel.

A demurrer was overruled as to the first special plea and replications were filed thereto. Demurrers were sustained to the other special pleas, and defendant elected to stand by them, and now urges that the court was wrong in sustaining said demurrers.

The second special plea professed to answer the whole cause of action, but did not pretend to set up any defense to the promise to pay $4,000 for past use of the patent, and was bad for that reason, and also because, under its averments, all that could be claimed by defendant would be the damage suffered, and no damages were alleged. The third special plea was bad because it failed to allege that defendant had been disturbed in the use of the patent. A licensee can not raise the question of the validity of a patent as between the patentee and the United States, where such licensee has not been molested; because in such case the licensee has got all he bargained for. Marston v. Sweet, 66 N. Y. 266; Dean v. Hodge, 35 Minn. 146. By the contract set out in the declaration defendant was only to be absolved

from further payment of royalties upon the patent being declared invalid by a court or board of arbiters. The same rules apply to the fourth amended special plea as to the third, and it presented no defense to the declaration. We think that there was no error in sustaining demurrers to said pleas.

There was a trial and a verdict was returned for plaintiff for $6,112.05, on which the court, after overruling a motion for a new trial, entered judgment.

The act under which appellant was organized provided 'for an annual election of officers, to be held at such time and place as the board of directors might designate, of which a written or printed notice should be given to each stockholder, personally, or sent to him through the post office, at least fifteen days before the day of election, at which election each stockholder would be entitled to one vote for each share of stock held by him. It appeared at the trial that a meeting of stockholders was held January 20, 1891, and that notice was not given as provided in said act. There was a publication of notice in a newspaper for two weeks prior to the meeting, but it was not equivalent to the notice provided by the act under which defendant was incorporated.

Every stockholder had a right to be present at that meeting, and it could not be legally held until after notice of the time and place had been given in an authentic and legal mode, unless all stockholders were present and consenting in person or by proxy. They were not so present. The whole number of shares was 1,078 and only 768 were represented at that meeting. It is claimed, however, that although the charter prescribed a mode of giving notice, it was not necessary to pursue that mode for the reason that a particular day was fixed by the by-laws. The by-law offered in evidence was as follows: "Article 1st. The corporation shall be under the control of a board of directors who shall be elected yearly, on the second Tuesday in June, in the city of Sterling, at such place and hour as shall be determined by the president and secretary, two weeks notice

of which time of election shall be published in some newspaper in the city of Sterling; and in case of the failure to elect on such day, for any cause, an election may be held on any Tuesday thereafter." The meeting in question was held in January, and the presumption that every stockholder knew the day in June appointed by the by-laws for the regular meeting would rather tend to prove the illegality of the meeting than its legality. Mr. Robinson, the president, testified that the time was afterward changed to January, but how or by whom does not appear. No record of any change appeared, and the only evidence of any day of which the stockholders had any notice by the records of the company was in June. Besides, if it be conceded that a by-law is notice of the day of a meeting so as to dispense with the notice required by the charter, a by-law like the one in question is still insufficient, because no place or hour is named. In San Buenaventura Com. Mining and Mfg. Co. et al. v. Vassault et al., 50 Cal. 534, it was held that the fact that a by-law names a day upon which, instead of a week within which, the annual meeting is to be held, while it may diminish, does not remove the uncertainty as to the time at which it is to be held, and that such a by-law is insufficient as notice. Even if the month was changed from June to January, so as to afford notice to the stockholders, the necessity of the statutory notice was not thereby removed.

At that meeting the plaintiff and three of his associate stockholders cumulated their votes upon themselves for directors, while the other stockholders each cast one vote for each share of stock held by them for each of the seven directors. The four received a majority of the votes cast, and they were a majority of the board that subsequently acted as such. The evidence proved, however, that by counting only the votes which the parties cumulating their votes were legally entitled to cast, there was still a majority of votes for said four persons as directors.

The persons so chosen as directors elected a president and secretary and acted as directors until the next meeting of stockholders, January 19, 1892. Said board met three times

during the year, once to elect the president and secretary, and twice to make this contract. At the time of the meeting of January 20, 1891, and previous thereto, the defendant was manufacturing the same style of gas engine mentioned in the contract, which plaintiff claimed as his invention and continued to manufacture and sell the same. At a meeting of the directors held June 29, 1891, the plaintiff and two other directors were appointed a committee to confer with plaintiff regarding the matter of royalties, and such committee was to report to an adjourned meeting to be held July 8, 1891. At the adjourned meeting held on the latter date, the plaintiff and the other directors, except C. E. Tracy, being present, the contract was authorized by the board and it bears that date. Plaintiff was one of the committee to confer with himself and one of the board that directed the making of the contract. After the making of the contract there was no visible change in the business of the company, but it continued to make and sell the same engine as before.

The questions raised and argued in this court touching the validity of the contract are mainly whether the plaintiff, as an acting member of the board of directors, was incapacitated in law from contracting for his own benefit with the corporation which he represented, through the board of which he was a member, so as to bind the corporation; and if he was not incapacitated by his relation to the corporation, whether the directors, having been permitted to act as such, had power to bind the corporation, as a *de facto* board, by a contract with plaintiff, who had notice of the irregularity and consequent infirmity of title to the office.

In considering the first question, the plaintiff is to be treated as a director, regardless of the manner of his election. Having claimed to be a director and acted as such, he is to be treated as such so far as his claim against the defendant is concerned. 1 Redfield on Railways, 584.

While a stockholder represents no interest but his own, a director occupies a trust relation toward all the stockholders. That relation demands that he should act in the interest of

those whom he represents. His authority is conferred upon the trust and confidence that it will be exerted only for the interest of the stockholders, and not for his private gain or advantage. Being so conferred, he is bound to manage the business intrusted to him in the interest of the stockholders alone, and by the most obvious rules of justice is forbidden to administer the affairs of the corporation for his private emolument. Accordingly, it has been held in numerous cases that a director can not, without the assent of the stockholders, become a contractor with the corporation, or have any personal or pecuniary interest in a contract between it and a third person, and that such contracts are voidable at the instance of the corporation or of stockholders. The corporation is entitled to the best efforts of the director for its exclusive benefit, and by entering into a contract with the board of which he is a part for his private gain, it is held that he disregards and violates his duty. He thereby places himself in a situation where his personal interests conflict with the interests of the stockholders and with the duties that he owes to them and the corporation. In Aberdeen Railway Co. v. Blaikie, 1 Macq. 461, it was held to be a rule of universal application that no one having duties to discharge of a fiduciary character shall be allowed to enter into engagements in which he has or can have a personal interest conflicting, or which may possibly conflict, with the interests of those whom he is bound to protect. In Wardell v. Railroad Co., 103 U. S. 651, a contract had been made, by direction of an executive committee of the board of directors of the Union Pacific R. R. Co., with Godfrey and Wardell, which contract was assigned to a corporation in which directors of the company were stockholders, and it was said to be among the rudiments of the law that the same person can not act for himself, and, at the same time, with respect to the same matter, as the agent of another whose interests are conflicting, and that directors of corporations can not enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits.

In Gardner v. Butler, 30 N. J. Eq. 702, it is said to be well settled that "directors of a company shall not be permitted to enter into engagements in which they have a personal interest conflicting with the interests of those whom they are bound by fiduciary duty to protect, and that no consideration of their apparent or intrinsic fairness will induce a court, either of law or equity, to enforce them against the resisting *cestui que trust.*" It is held that a trustee can not fortify himself with a contract in violation of duty, and set it up either in law or equity as a valid obligation. In the case of Thomas v. Brownville, Fort Kearney and Pacific R. R. Co., 109 U. S. 524, a contract made by directors of a railroad company with a construction company in which they were interested was held voidable, and stockholders having repudiated the contract it was held void. The rule that a trustee can not enter into any relation or place himself in any position which would subject him to conflicting duties or expose him to the temptation of acting contrary to the best interests of his *cestui que trust* applies to directors, and a contract connected with the trust or its management entered into in violation of duty is voidable, and may be defeated or set aside at the suit of the beneficiary. 2 Pomeroy's Eq. Jur., Sec. 1077; San Diego v. San Diego & L. A. R. R. Co., 44 Cal. 106; Barnes v. Brown, 80 N. Y. 527; Risley v. I. B. & W. R. R. Co., 62 N. Y. 240; Railroad Co. v. Poor, 59 Me. 277; Flint, etc., Railroad Co. v. Dewey, 14 Mich. 477; Paine v. L. E. & L. R. Co., 31 Ind. 283; Hoffman Steam Coal Co. v. Cumberland Coal Co., 16 Md. 456; Simons v. Oil Co., 61 Penn. St. 202; In re Coalbrook Railway Co., 18 Beav. 339; Coal Co. v. Sherman, 30 Barb. 553.

It is contended that the question has been settled in this State the other way. We do not so understand. The only questions that have been before the Supreme Court, so far as we know, relate to the right of directors or officers to loan money to the corporation and take securities, and to obtain payment of debts due them from the corporation. In Merrick v. Peru Coal Co., 62 Ill. 472, the question was

whether Merrick, who was an officer of the corporation, and who had purchased with his own means, notes and drafts made by the corporation to persons in no wise connected with it, and which were undeniably binding upon it, could sue and recover from the corporation the money paid for the same. It was there said that an officer of a corporation has a right to deal with it in the same manner as strangers may, and in such case each party acquires the same rights and incurs the same liabilities as would strangers; but the only kind of dealing that was in question was that above stated, and the court subsequently refused to be bound by what was said.

In Harts v. Brown, 77 Ill. 226, the question was whether a director could loan money to the corporation and take a mortgage on corporate property with a power of sale. In that case the Supreme Court said: " We have never known it questioned that a director or stockholder may trade with, borrow from or loan money to the corporation of which he is a member, on the same terms and in like manner as other persons. He then had power to loan money to the company and they became liable to pay the same." This statement was evidently intended to refer only to a loan of money.

Darst v. Gale, 83 Ill. 136, was a bill to enjoin a sale on a trust deed executed by a corporation to Pulsifer and others, and it was held that the fact that Pulsifer was for a time one of the directors of the corporation, in the absence of evidence showing bad faith in his transactions with the company, was of no moment; and that he might, acting in good faith and fairly, as lawfully advance money to the corporation, upon the faith of its securities, as any one else.

In Beach v. Miller, 130 Ill. 162, Miller, who was a director, had loaned the corporation $2,000 and taken judgment notes. The president and secretary sold to him property to the amount of $1,877, to be applied as a payment on the notes. The judgment in favor of Miller, based on rights claimed under that sale, was reversed on account of a refusal to admit evidence of the insolvency of the corporation at the time of the sale, and it was held that the facts offered

to be proven were proper for the consideration of the jury on the question whether the sale to Miller was fraudulent as to other creditors. It was there said: "While a corporation remains solvent, we perceive no reason why a director, with the knowledge of the stockholders, may not deal with the corporation, loan it money, take security or buy property of it, in like manner as a stranger. * * * So long as a corporation remains solvent, its directors are agents or trustees for the shareholders. They owe no duties or obligations to others."

But it was held that if the corporation was insolvent, the directors would occupy a different relation and hold its assets in trust for creditors, and in that event Miller could not take the property purchased in exclusion of the other creditors, but would take it charged with a trust in favor of all creditors, himself included, and all should share in it. It was there further said that the expressions made in Merrick v. Peru Coal Co. and Harts v. Brown, *supra*, to the effect that a director had a right to deal with his corporation the same as a stranger, were not authorized by the cases under consideration.

In Roseboom v. Whittaker, 132 Ill. 81, the rule laid down in Beach v. Miller, *supra*, and above quoted, was repeated and affirmed. By that rule the directors of a corporation during its solvency are agents or trustees for the stockholders, and it is made a condition of their right to deal with the corporation that such dealings shall be with the knowledge of the stockholders.

The requirement of knowledge presupposes a right in the stockholders of approval or rejection of proposed dealings, for knowledge merely would be of no avail unless for the purpose of enabling them to exercise a right.

In none of these cases was there any contract of the nature of the one in question, and they all come within a recognized exception to the rule, as will be hereafter seen.

In Beach v. Miller the court refers to the following cases as announcing the correct doctrine concerning dealings of a director with his corporation. Twin Lick Oil Co. v. Mar-

bury, 91 U. S. 587; Whitehall v. Warner, 20 Vt. 425; Smith
v. Lansing, 22 N. Y. 526; City of St. Louis v. Alexander, 23
Mo. 483.

Twin Lick Oil Co. v. Marbury was a case where Marbury,
who was a director of the Twin Lick Oil Co., loaned the cor-
poration $2,000, for which a note was given secured by a
trust deed. The property was sold under the trust deed and
bought for Marbury and conveyed to him. The bill in the
case was filed four years afterward, to have him declared a
trustee of the corporation and for an accounting. The court
found that the loan was made in good faith, to assist the cor-
poration in embarrassment, and that the purchase by Mar-
bury was the only way for him to make his money. The
court said that contracts of directors with their corporations
were generally not absolutely void, but voidable, and that
no rule of law forbade a director loaning money to the cor-
poration in good faith when it was needed. Such a rule, it
was said, would deprive a corporation of the aid of those
most interested in it and most likely to render assistance,
and would afford no protection to the corporation. The
court declined to decide whether the sale and deed were
voidable at the election of the company, because the com-
pany came too late with the offer to avoid the sale.

The case of Whitewell v. Warner, 20 Vt. 425, holds that
constructive fraud is not to be predicated of the mere fact of
a stockholder availing himself of his superior advantages to
obtain security for debts due to himself to the exclusion of
other creditors; and that while the courts would no doubt
guard the exercise of such a privilege with some degree of
severity, yet they should not watch the exercise of a right
with so much strictness as to declare its mere exercise to be
a constructive fraud.

The case of Smith v. Lansing, 22 New York, 520, was a
suit by Smith, as receiver of a bank which had no board of
directors, against Lansing, who was president and managing
officer and agent of the bank, which had applied for and re-
ceived deposits of canal moneys of the State of New York,
upon condition that it should give security for the return of

such deposits; and Lansing had entered into bonds for the repayment of the moneys so deposited, and had purchased in his own name three parcels of real estate upon which the bank had mortgages, and the entire consideration paid or allowed was the money and property of the bank. He took the conveyances to himself for the purpose of securing himself and his co-sureties for their liabilities aforesaid.

The judge below held that the defendant could hold the lands to secure himself and his co-sureties for the sum of $48,501.78, which they had paid or remained liable to pay, and he ordered judgment for a conveyance to the receiver, upon his paying that sum, or that, at the election of the plaintiff, the lands should be sold and the first proceeds appropriated to indemnify the president and his co-sureties. This judgment was reversed at the general term, but was affirmed by the Court of Appeals. It was said : " It is undeniably a well settled general rule that where one acts as agent, trustee, guardian, executor, or administrator in the purchase or sale of property, or in the transaction of other business, in a fiduciary relation, the law will not permit him, in such purchase, sale or transaction, to act in his own name and for his individual benefit. This rule has been established in consequence of the liability of mankind to be influenced by the motive of selfishness, which would, in most cases, lead the agent, etc., to give an undue prominence to his own interest, to the injury of that of his principal, etc. ' This rule,' says Judge Story, ' is founded on the plain and obvious consideration that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence and zeal of the agent, for his own exclusive benefit. It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interests of his principal, as far as he lawfully may; and, if impartiality could possibly be presumed on the part of the agent, where his own interests were concerned, that is not what the principal bargains for; and, in many instances, it is the very last thing which would advance his interests.' Story on Agency, Secs. 210, 211, and authorities there cited. In the case of Moore v. Moore, 1 Seld. 256,

Judge Gardiner uses the following language: 'The law does not stop to speculate upon the probabilities that the agent has resisted temptation; it removes the temptation, by proclaiming in advance that he shall not acquire the property. The rule is a most reasonable and wholesome one, and has been too long settled to require the approbation of this court to commend it to the judgment and conscience of every intelligent mind for its support.' If, therefore, the present case falls within the influence of this principle, the judgment of the general term of the Supreme Court should be affirmed."

It was held, however, that the case did not come within the rule; and that it was lawful for Lansing to apply for and receive the moneys, and his duty to do so, if he supposed they could be used to advantage in the business of the association. The moneys could not be obtained without security beyond the corporate responsibility of the association; he was then bound to furnish such security, if in his power, and in doing so it was lawful for him to pledge the property of the association to indemnify the sureties. He procured others to unite with him on the bonds, and had a right to indemnify himself and his co-sureties through the property and means of the association against his and their liabilities so incurred. To secure such indemnity was a duty the defendant owed not only to himself, but pre-eminently to the sureties whom he had procured to be bound with him; and it was held that what was fairly and honestly done for such purpose should be allowed to stand.

The case of City of St. Louis v. Alexander, so far as the question of the right of a director to deal with the corporation was involved, related only to the right of such director, who is also a creditor, to use any fair means to obtain security for his debt.

It will be seen, therefore, that the cases referred to by the Supreme Court in Beach v. Miller, were of the same character as the cases decided by that court, and did not relate to the right of a director to enter into a contract of the nature of this one, by which $4,000 was to be transferred from the

assets of the corporation to the director, and he was to have ten per cent of the proceeds of its business for a long term of years. The cases either relate to making advances to, or incurring liabilities for the corporation in good faith and obtaining payment or security therefor, or belong to the class of Beach v. Miller, which was merely a competition among creditors, where the corporation had no interest. It is not supposed, because a creditor is also a director, that he is thereby disqualified from entering into fair competition with other creditors. This case involves the question whether a director having duties of a fiduciary nature to discharge toward stockholders shall be allowed to enter into a contract of this kind, in the making of which he has a personal interest conflicting with the interests of the stockholders whom he is bound to represent and protect, and shall be allowed to enforce such contract against the resisting corporation. We have not been able to find any case where such a contract has been so enforced, and we think that this one can not be.

As held in Twin Lick Oil Co. v. Marbury, *supra*, a loan of money to the corporation when needed is not within the rule, because to apply the rule in such case would deprive the corporation of aid and afford it no protection. See also Sutter Street R. R. Co. v. Baum, 66 Cal. 44, where it is held that a director may advance money to the corporation in good faith. 1 Beach on Private Corporations, Sec. 245. So in Dunscomb et al. v. N. Y. H. & N. R. R. Co. et al., 84 N. Y. 190, it is said that the rule can have no application where the transaction consists in the officer taking collateral security for a debt honestly due him, since the payment of the debt or the discharge of the liability is an essential prerequisite of the avoidance of the transaction; but the general rule of a disability imposed upon a director to deal in his own behalf in respect to any matter involving his duties to the stockholders is distinctly recognized.

Advances of money by directors in good faith and in case of need, and taking security for repayment, are upheld by the courts, and a rule against them would be injurious

rather than beneficial to stockholders. Besides, there is no rule which prohibits a corporation from availing itself of property of a director necessary for its convenience or profit, under circumstances implying a contract to pay a reasonable compensation therefor. Rider v. Union India Rubber Co., 5 Bosw. 85. If money has been advanced or property furnished in good faith by a director, the corporation is liable to him on an implied assumpsit. The rule is not made to enable a corporation to appropriate the money or property of a director for less than it is reasonably worth, and there may be a recovery of such reasonable worth. So that in case of a loan there is an enforceable implied contract regardless of the express contract. The rule is adopted to secure justice, not to work injustice; to prevent a wrong, not to substitute one wrong for another; and there may be a recovery upon a *quantum meruit*. Wardell v. Railroad Co., 103 U. S. 651; Gardner v. Butler, 30 N. J. Eq. 702.

The view we have taken of the contract renders it unnecessary to consider the question concerning the power of a *de facto* board as between a member of such board and the corporation, since the liability of the corporation for the value of the right appropriated and used would be the same in any view of that question. There would be an implied contract to pay what the use of the patent was reasonably worth.

There are some objections to instructions given for plaintiff. The first told the jury that if two-thirds of the capital stock was represented at the meeting at which plaintiff and his associates, James Charter, L. M. Barrett and C. F. Tracy, were said to have been elected, and that a majority of the stock so represented was cast for the said four directors, then said directors should be considered legally elected. It ignored the question whether any notice was given which would authorize holding the meeting at all, and was bad. The third stated that although the jury might believe that the contract was made by a board irregularly elected, yet if they further found from the evidence that defendant, by its subsequent conduct, ratified the making of such contract,

they should find for plaintiff. As it is a question of law what will make a valid contract, so it is a question of law what will make it valid as a ratification, if proven; and the instruction was wrong in allowing the jury to determine that the contract was ratified from any fact appearing in evidence which they might fancy a ratification.

The fourth and fifth stated that if defendant made and sold gasoline engines according to the contract, then the defendant had ratified the contract. No one could ratify the contract except those who could have made or authorized it, and the only evidence of action under the contract and in acknowledgment of it was by the persons who made it.

They could not ratify their own contract so as to bind any one whom they could not bind by making it. Paine v. L. E. & L. R. R. Co., 31 Ind. 283. Such a contract is not void, but voidable at the election of the parties affected; and while the stockholders might prefer to ratify it, or submit to it, yet the ratification or acquiescence which would prevent them from resisting it must be established by their conduct. The right to repudiate must be lost by affirmative act, or by unreasonable delay after opportunity to act with freedom, and with full knowledge of all material facts.

In Mallory v. Mallory Wheeler Co., Supreme Court of Errors, Conn., June 1, 1891, 5 Am. R. R. & Corp. Rep. 509, a suit for salary as manager and director of a corporation was successfully defended against on the ground of the personal interest of the directors making the contract. The contract was entered into October 31, 1887. There was a stockholders' meeting in May, 1888, and there was no evidence that the stockholders knew of the contract before that, and there was no other meeting until the annual meeting in May, 1889, when a new board of directors was chosen, that repudiated it; and it was held that the delay could not operate as ratification, waiver, acquiescence or estoppel, and that the right of the corporation to avail itself of the original invalidity of the contract was not lost. Such a contract, being voidable merely, does not necessarily require any inde-

pendent and substantive act of ratification; but it may become finally established as a valid contract by acquiescence for such a length of time as would amount to a waiver of the right to avoid it.   Kelly v. N. & A. Horse R. R. Co., 141 Mass. 496.   But the contract did not become binding on the stockholders from the fact that there was some manufacture and sale of gasoline engines by the same board that made the contract.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*